# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| BEVERLY HILL § | |
| § | |
| *Plaintiff,* § | |
| § | |
| v. § | Civil Action No. SA-18-CV-897-XR |
| § | |
| KERR COUNTY, § | |
| § | |
| *Defendant.* § | |
| § | |
| § | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant Kerr County's motion for summary judgment (docket no. 25), Plaintiff Beverly Hill's response (docket no. 26), and Defendant's reply (docket no. 27). After careful consideration, Defendant's motion is DENIED.

## BACKGROUND

This case arises out of Plaintiff Beverly Hill's ("Plaintiff") former employment with the Sheriff's Office in Kerr County ("Defendant").[1] Docket no. 15. Plaintiff began working at the Kerr County Sheriff's Department as a dispatcher on June 5, 2016. Docket no. 25-2 at 10. As a dispatcher, Plaintiff was aware of two specific workplace policies. *Id.* at 11–12. First, Policies and Procedures Section 2.3 provided that "[o]fficers and employees will not knowingly give any false or misleading information concerning the duties, responsibilities or actions of the Office…nor withhold any information that is their duty to report…." *Id.* at 56 (truthfulness policy). Second,

---

[1] Plaintiff's initial complaint named both Kerr County and Kerr County Sheriff's Office as defendants. Docket no. 1. Plaintiff later amended her suit, dismissing the Sheriff's Office, leaving the larger governmental entity, Kerr County, as the sole remaining defendant. *See* docket no. 15.

Section 4.15 provided that "[a]ffairs consisting of married employees with any other persons regardless of their marital status or if they are employed by this agency, or single employees with any married person are strictly forbidden and grounds for immediate termination." *Id.* at 64 (extramarital affairs policy).

Plaintiff's husband, Tommy Hill ("Mr. Hill"), worked for Defendant as a corrections officer. Docket no. 25-3 at 7. On April 2, 2018, Plaintiff and Mr. Hill were involved in a domestic disturbance at their home. Plaintiff returned home that evening, admittedly angry at Mr. Hill. The two began arguing, upon which Plaintiff admits she "smacked [Mr. Hill's] phone out of his hand." Docket no. 25-1 at 91. The dispute ended when Mr. Hill, in his own words, "jumped up and…charged her and…grabbed her and…placed her on the floor and…put her hands above her head." Docket no. 25-3 at 19. Plaintiff then left the residence and made a report with the Sheriff's Department. *Id.* The Department decided to forward the case to the Assistant County Attorney. Docket no. 25-2 at 82.

When Plaintiff went to the Sheriff's office to inquire about the status of that case, Clay Barton ("Barton"), the Chief Deputy, informed her that the prosecutor decided not to prosecute the case and that Sheriff W.R. "Rusty" Hierholzer's ("Hierholzer") investigation into the assault case turned up other policy violations that could affect her employment. *Id.* at 73, 82.[2] Barton informed Plaintiff that a previous affair she had with Sean Feldmann ("Feldmann"), a Sheriff's deputy, was now known. Hierholzer was aware of that affair from information he received from Mr. Hill during the Sheriff's investigation of Mr. Hill for assault. Docket no. 25-1 at 110. Plaintiff stated that if

---

[2] Sheriff Hierholzer does not believe that Mr. Hill engaged in any policy violations arising from the domestic disturbance on April 2nd. Docket no. 25-1 at 31. He believes the marks on Plaintiff's arms were from her not staying still while she was restrained, or alternatively from the rug on which Plaintiff was pinned. *Id.* at 32. He believes he *could* have found a policy violation from those events but chose not to. *Id.* at 31.

she lost her job over an extramarital affair, Mr. Hill should as well because he had also engaged in an extramarital affair. *Id.* at 82.

On April 5, 2018, Plaintiff returned to work to meet with Hierholzer. Amanda Jemeyson (Plaintiff's immediate supervisor) and Clay Barton were present. Docket no. 25-2 at 82. Hierholzer, having heard from Mr. Hill that Plaintiff had an extramarital affair, sent Plaintiff to a connected conference room where he ordered her to write a statement. *Id.* at 23. In that statement, Plaintiff admitted to having sex once with Deputy Feldmann while she and her husband were separated. *Id.* at 73. After sending Plaintiff back to the room when he felt the statement was not sufficiently complete, Hierholzer called Plaintiff a "hothead" and said that she went home that evening asking for a confrontation between her and Mr. Hill. Docket no. *Id.* at 21, 23.

Initially, Hierholzer took no employment action because he often excused extramarital affairs that occurred while the married couple was separated, and Plaintiff and Mr. Hill were separated at the time of the confessed encounter between Plaintiff and Feldmann. *See* docket no. 25-1 at 17 (noting his determination of whether the affair merits termination is determined on a "case-by-case" basis). That same day, Feldmann wrote Hierholzer a letter in which he admitted to the affair, at first claiming it only happened once and that it was during Plaintiff and Mr. Hill's separation. Docket no. 25-2 at 74. A week later, however, Feldmann amended his statement to Hierholzer, this time claiming that the two had sex multiple times over a several-week period. *Id.* at 74, 85; docket no. 25-1 at 24. Plaintiff maintains that this was a one-time occurrence. Docket no. 25-2 at 18–19.

The investigation also revealed that Plaintiff may have had an affair with another employee, Deputy Justin Outlaw ("Outlaw"). Outlaw wrote a letter to Hierholzer, confessing to a one-time sexual encounter in 2017. Docket no. 25-2 at 76. That letter remarked that Plaintiff's

3

husband was okay with the affair because he, too, admitted to having sexual intercourse with other people during their marriage. *Id.* When asked, Plaintiff denied the allegation that she had an affair with Outlaw. Docket nos. 25-1 at 24; 25-2 at 25.[3] Hierholzer also claimed Plaintiff had an affair with another employee, Ray Valero ("Valero"), which Plaintiff denies. Docket no. 25-2 at 41. Valero also denies sleeping with Plaintiff, and when Hierholzer asked him to take a polygraph, he refused to do so and resigned instead. Docket no. 25-1 at 35–38.

During the investigation, Hierholzer also spoke with Mr. Hill, Plaintiff's husband. Docket no. 25-3 at 19. Hierholzer asked Mr. Hill whether he and Plaintiff were divorcing; when asked *why* they were indeed divorcing, Mr. Hill remained quiet. Hierholzer then asked, "She's messing around on you, isn't she? Well, who is it?" Docket no. 25-3 at 21–22, 24. Mr. Hill responded that Plaintiff had an affair with Feldmann and that this happened once while he and Plaintiff were separated. *Id.* Mr. Hill claimed—multiple times—that Hierholzer did not ask him whether he had himself had any extramarital affair. *Id.* at 21, 22–23, 28, 34. Indeed, Mr. Hill testified that no one asked him if he had any extramarital affair. *Id.* at 34. Hierholzer, on the other hand, claims that he was aware of the allegation that Mr. Hill had an affair, that he asked Mr. Hill about it, and that Mr. Hill denied as much. Docket nos. 25-2 at 82, 25-1 at 26–27.[4] Rather than investigating the matter himself, Hierholzer had a jail administrator speak with Mr. Hill and the woman he was allegedly sleeping with. Docket no. 25-3 at 2. Both denied the allegations, and the record reveals no further investigation of the matter. *Id.* Nonetheless, Mr. Hill admits that he did indeed have a sexual

---

[3] Defendant goes to great lengths to explore any sexual relationships Plaintiff may have had with other employees, but these alleged events took place well after Plaintiff was terminated and, therefore, have no relevance to this case.

[4] Indeed, Mr. Hill wrote a text to Plaintiff, stating "I'm no longer talking to her. I'm no longer doing anything with anyone." Docket no. 26-1 at 1. "Her" presumably refers to Mr. Hill's alleged relationship with Lorissa Cossu, another corrections officer. Docket no. 25-3 at 30.

relationship with another employee. Docket no. 25-3 at 33.[5] Mr. Hill still works at the same job. Docket no. 25-1 at 13.

The investigation into Plaintiff resulted in the following employment decisions: (1) Plaintiff was terminated for violation of the truthfulness policy (with respect to the number of times she slept with Feldmann), improper conduct, and the extramarital affairs policy; (2) Feldmann was terminated for the same policy violations; (3) Outlaw was suspended for thirty days without pay for violation of the extramarital affair policy; and (4) Mr. Hill was found to have not violated any policy and remains employed today. Docket nos. 25-2 at 78, 25-1 at 110.

## DISCUSSION

### I. Standard of Review

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear

---

[5] *Compare* docket no. 25-1 (Sheriff Hierholzer's deposition):

> Q: Did you ever ask Tommy Hill if he had had an affair?
> A: I did.
> Q: And what did he say?
> A: He denied it.

*with* docket no. 25-3 at 22–23 (Mr. Hill's deposition):

> Q: [D]id the Sheriff ask you whether you had had any relationships with anybody?
> A: No.
> Q: He never asked you that?
> A: No ma'am.

5

the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the non-moving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.  Analysis

Plaintiff claims that Defendant discriminated against her on the basis of sex in violation of Title VII. Docket no. 15. Defendant, in turn, argues that Plaintiff cannot show sex discrimination because she has not shown she was treated less favorably than someone who was similarly situated and, therefore, cannot meet her prima facie burden. Docket no. 25 at 4. Alternatively, Defendant argues that it has presented a legitimate, nondiscriminatory reason, namely Plaintiff's violation of the extramarital affairs policy. *Id.* at 7.

Title VII prohibits employers from intentionally discriminating against individuals with respect to compensation, terms, conditions, or privileges of employment based on the individual's gender or other protected class. 42 U.S.C. § 2000e–2(a)(1); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647. 651 (5th Cir. 2004). A plaintiff can show such intentional discrimination either through direct or circumstantial evidence, and where there is no direct evidence, a plaintiff may prove his or her cause of action using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). Under that framework, a plaintiff must first establish a prima facie case of intentional discrimination. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If satisfied, that creates a presumption of intentional discrimination. *Id.* The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the employer sustains that burden, the presumption of intentional discrimination dissipates, and the burden shifts back to the plaintiff to offer sufficient evidence that either (1) the employer's proffered reason is not true but is instead a pretext for discrimination, or (2) the employer's reason, while true, is not the only reason for the conduct, and plaintiff's protected characteristic was another "motivating factor." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007); *McCoy*, 492 F.3d at 556; *Williams v. Time Warner*, 98 F.3d 179, 181 (5th Cir. 1996).

To establish a prima facie case, a plaintiff must show that he or she "(1) is a member of a protected class, (2) was qualified for the position at issue, (3) was the subject of an adverse employment action, and (4) was treated less favorably than other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Anderson v. Venture Express*, 694 F. App'x 243, 246 (5th Cir. 2017). The parties here do not dispute that

Plaintiff belonged to a protected class, that she was qualified for the job, and that Defendant made an adverse employment decision. The crux of the dispute is whether Plaintiff was treated less favorably than her husband, Mr. Hill, who was subject to no adverse employment action for the same alleged behavior—an extramarital affair while employed by the Sheriff's Office.

To make such a determination, the Court would need to determine whether Plaintiff and Mr. Hill were "similarly situated" such that the less favorable treatment of Plaintiff constitutes intentional discrimination. A comparator like Mr. Hill is considered "similarly situated" if the two held the same job responsibilities, worked for the same supervisor or had their employment status determined by the same person, had essentially comparable violation histories, and whether the conduct that drew the adverse employment decision was "nearly identical" to that of the proffered comparator who allegedly drew a dissimilar employment decision. *Moore v. Univ. of Miss. Med. Ctr.*, 719 F. App'x 381, 385 (5th Cir. 2018). The conduct of Plaintiff and the proposed comparator, Mr. Hill, must have been "nearly identical." *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).

Given the competing accounts—indeed, a genuine dispute—of the relevant events, the Court cannot make such a determination. Whether Hierholzer investigated Mr. Hill's alleged affair is material in determining whether Mr. Hill and Plaintiff were treated equally, and whether a male and female were treated equally is crucial in a gender discrimination suit. Hierholzer insists he asked Mr. Hill about Mr. Hill's alleged affair with a coworker. Docket no. 25-1 at 26. Mr. Hill, on the other hand, insists—even when asked by defense counsel—that Hierholzer never asked him about his own extramarital affair. Docket no. 25-3 at 21–23, 28, 34. If Hierholzer did not ask Mr. Hill about his own alleged affair (and Hierholzer was aware of those allegations, *see* docket no. 25-2 at 82), then the fact that Hierholzer questioned Plaintiff about her alleged affair and sent her

to a conference room to write out an explanation would, at minimum, allow Plaintiff to meet her prima facie burden of showing she was treated differently.[6] The same is true with respect to why Hierholzer met in person with Valero and asked him to take a polygraph test to determine whether he had a relationship with Plaintiff but did not do the same with the allegations of Mr. Hill's affair, with Feldmann's amended assertion that he slept with Plaintiff multiple times, or with Outlaw's claim of an affair and Plaintiff's subsequent denial. Docket no. 25-1 at 35–38. Making a determination here, which the Court would have to do to grant Defendant's motion, would involve a determination as to credibility, and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255; *International Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991); *see also Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 ("[T]he court must review all of the evidence in the record but make no credibility determinations or weigh any evidence.").

There are other disputes the resolution of which is inappropriate for the Court to make at this stage because the resolution would require a credibility determination, essentially deciding between two separate versions of the events. Plaintiff denies she had an affair with Outlaw. Docket nos. 25-1 at 24; 25-2 at 25. Outlaw, on the other hand, reported that he had a one-time affair with Plaintiff (docket no. 25-2 at 76–77), and Hierholzer proffers Plaintiff's alleged lie about Outlaw as a reason for her termination. Docket no. 25-1 at 23. Whether the factfinder believes Plaintiff or Outlaw/Hierholzer, as well as the extent to which Hierholzer investigated Outlaw's claim relative to Plaintiff's, would be necessary in a determination as to whether Defendant's proffered reason

---

[6] The same is true with respect to why Mr. Hill remains employed by Defendant despite admitting that he, too, had an affair. Docket nos. 25-3 at 33; 25-1 at 13.

for firing Plaintiff was pretextual. The same is true with respect to why Outlaw was suspended for thirty days for the same behavior for which Plaintiff was fired. Docket no. 25-1 at 26.

**CONCLUSION**

This case presents a true "he-said-she-said" scenario, the disagreement between what was said is vehement and genuine, and a determination of who said what (and who to believe) is material to the outcome of this case. For those reasons, Defendant's Motion for Summary Judgment (docket no. 25) is DENIED. The Scheduling Order (docket no. 22) remains in effect, including the pretrial conference scheduled for February 4, 2020 at 10:30 A.M in Courtroom 3.

It is so ORDERED.

SIGNED this 13th day of January, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE